## MACER'S APPEAL.

Where a power to sell real estate is given to the executor in his discretion, a sale by him converts realty into personalty.

An uncle is entitled to inherit personalty in preference to first cousins.

Appeal from Orphans' Court of Bradford County. No. 22, January Term, 1881.

The auditor appointed to distribute the estate of Isaiah Gilmore found the following facts, *inter alia:*

Second. Noble Macer, deceased, then a resident of the city of Baltimore, died suddenly in that city in 1859. He was

unmarried and without issue, and left to survive him a brother, Noah Macer, and a sister, Harriet Gilmore. He left an estate consisting of about ten thousand dollars in cash, one house on Little Monument street, one horse and dray, and a lot on Division street, on which he had created a ground rent of $30. His estate was administered by Simon Smith, who settled an account in the Orphans' Court there. His estate was equally divided between his brother, Noah Macer, and his sister, Harriet Gilmore, each receiving in all about six thousand dollars.

Third. Noah Macer, the brother, died about 1872 or 1873, leaving a widow, Ellen Macer, two children, Noble and Anna Maria, (now the wife of Horace Williams) and three grandchildren, James, Edward and Lewis, these three being the children of Elizabeth Breckenridge, a deceased child of said Noah. The two children and three grandchildren named are the only living descendants of Noah Macer. He left no brothers or sisters surviving him. His widow, Ellen Macer, is living in Canton township, where her children also reside. The residence of Elizabeth Breckenridge's children does not appear in evidence. Noah Macer moved with his family from Baltimore to Canton township, about 1861 or 1862, where he bought a farm and where he died.

Fourth. Harriet, the sister of Noble Macer, deceased, was married to Isaac Gilmore in Baltimore about 1830, and the only issue of this marriage was one son, Isaiah Gilmore, (who was born in that city about 1832 or 1833) the decedent.

Fifth. Isaac Gilmore, the husband of Harriet, separated from his wife, and for several years neglected to provide for her and his child. They were supported and cared for by and lived with her bachelor brother, Noble, she keeping house for him in Baltimore. Isaac died a number of years ago—just when does not appear. He accumulated no property and left none. His father and mother were dead. No sisters or brothers nor any descendants of such survive him, except John, a brother, who claims this fund as uncle and next of kin to Isaiah, the decedent.

Sixth. About 1860, Harriet Gilmore and her son, Isaiah, moved from Baltimore into Bradford County, Pa., and settled on a farm in Canton township, in said county. This farm,

containing about 57½ acres, was conveyed to Harriet by Sheldon H. Lindley and wife by deed acknowledged Dec. 19, 1860, the consideration being $1,625, which was paid out of the fund which she derived from the estate of her brother, Noah Macer. She stocked the farm, and she and her son lived thereon until her death, which occurred in June or July, 1871.

Seventh. Before the death of Harriet, her son, Isaiah had contracted intemperate habits, was frequently intoxicated, and by the common speech of the neighborhood where he lived he was a common drunkard.

Eighth. Harriet left a will as follows:

"In the name of God, Amen. I, Harriet Gilmore, of the "Township of Canton, County of Bradford, and State of Pennsylvania, widow, having arrived at an advanced age, and "being weak in body, but sound of mind and memory, and "considering the uncertainty of this transitory life and of all "human events, do make and publish this my last will and "testament in manner and form following, to wit:

"First. It is my will and I do hereby order and direct that "all my just debts, if any may remain, and funeral expenses "be duly paid and satisfied as soon after my decease as it "conveniently can be done.

"Second. I give and bequeath to my son, Isaiah Gilmore, "all my estate, both real and personal, that may remain at my "decease to be and remain under the care and direction of a "guardian for his use and benefit, except what I have hereinafter otherwise devised.

"Third. I give to the children of my niece, Elizabeth Breckenridge, now deceased, whom I brought up in my family from "the age of six or seven years until her marriage, the sum of "three hundred dollars due me from my brother, Noah Macer, "to be collected by her husband or guardian of said children "and placed at interest for their benefit, the principal to be "paid to them severally as they may become of age, and the "interest to be paid annually to their father or guardian "toward their support, and which shall be strictly so applied "to the satisfaction of my executor.

"Fourth. I do hereby order and direct that a certain lot "which I now own in the City of Baltimore, in the State of "Maryland, be sold by my friend Simon Smith, of Baltimore, "and the avails paid to my executor for the benefit of my son, "Isaiah, and placed at interest for his use.

"Fifth. I hereby appoint my friend, William S. Jayne, of "Canton Township, County of Bradford, and State of Penn-"sylvania, to be the executor of this my last will and testa-"ment, to see that the same is fully carried into effect; and "further, I hereby also appoint the said William S. Jayne to "be the guardian perpetually over the property devised to my "son, Isaiah Gilmore, with full power and authority to appoint "a successor in case of death, removal or any inability to longer "serve, to see that his estate hereby devised both real and per-"sonal be properly taken care of, and not permit him to "squander the same in any useless manner or enterprise so far "as it can reasonably be done by the guardian, but that it may "all be strictly applied for his benefit during his life time in "such manner as shall be for his comfort; and further, I hereby "authorize and empower my executor if it should at any time "become necessary under any circumstances hereafter in his "judgment or that of his successor, to sell all my real estate "and secure the avails on bond and mortgage at interest for "the use of my son, Isaiah Gilmore, during his life time; and "further, I desire my executor, or his successor as guardian, to "call the attention and consult my esteemed friend, Simon "Smith, of Baltimore, Maryland, at any time before a sale is "made of the same, if living.

"In witness whereof I have hereunto set my hand and seal "this first day of May in the year of our Lord one thousand "eight hundred and seventy-one.

"Signed,          HARRIET GILMORE, [seal.]
          "By her order and in her presence."

"Signed and sealed in the presence of us who have hereunto "subscribed our names in the presence of each other.

"Signed,          ORRIN C. HORTON,
          WM. B. BARNES.

"I, Harriet Gilmore, the within named testator, do hereby "make and publish this codicil to be added to this my last "will and testament in manner following, to wit: .

"I hereby fully revoke that part of article fifth which re-"quires my executor to consult my friend, Simon Smith, of "Baltimore, Maryland, before acting in any matter in relation "to the settlement of my estate. In witness whereof I have "hereunto set my hand and seal this fifth day of June in the "year A. D., 1871.

Signed,                HARRIET GILMORE, [seal.]
                "By her order and in her presence."

"In presence of
   "Signed,                O. C. HORTON,
                           WM. B. BARNES."

W. S. Jayne, the executor named in the said will, caused the same to be duly probated, and letters testamentary were duly issued to him on the 1st day of August, A. D. 1871, by C. E. Gladding, Register for the probate of wills in and for the County of Bradford. Said Jayne entered upon his duties as such executor, and also as testamentary guardian or trustee of the estate which Harriet Gilmore by said will had given, bequeathed and devised to her son, Isaiah, said Jayne by said will having been appointed such testamentary guardian or trustee.

Ninth. The stock and personal property on the farm, and also the household furniture which were left by Harriet Gilmore, were, soon after her death, turned over by the executor to Isaiah.

Tenth. The executor bought a house and lot (one acre) in Canton township, which was deeded by Robert Sawyer and wife to "William S. Jayne, executor and trustee of the estate of Harriet Gilmore," by deed acknowledged the 3d day of April, A. D. 1872, the consideration being $250. W. S. Jayne takes credit in his partial account as trustee for the sum of $250, as "paid M. C. Wright on contract for house and lot." The evidence does not disclose whether this is the same house

and lot bought from Sawyer and wife.   The house and lot was never disposed of by Jayne, but remains the property of the estate.

Eleventh. The farm was sold by the executor, under a power in the will of Harriet Gilmore, to Solon J. Hickok, by deed bearing the date April 23, 1872, acknowledged same day for $3,000; $500 was paid down, and the residue was secured by bond and mortgage on the place.   Part of the money so secured was collected by said Jayne as testamentary guardian or trustee, and the remainder thereof by T. S. Manley, administrator of the decedent, as shown by their several accounts.

Twelfth. Isaiah Gilmore died intestate on or about the 28th day of October, A. D. 1875.   Having never married, he left neither widow nor children.   Letters of administration were duly granted to T. S. Manley on the 5th day of March, A. D. 1878, who administered upon said estate.

Thirteenth. Wm. S. Jayne, as executor of Harriet Gilmore, filed a partial account and also a final account, which last was finally confirmed by the Court May 8, 1879.   His final account as such *executor* shows a balance in his hands of $130.46.   *As testamentary guardian or trustee*, he also filed two accounts, a partial account and a final account, the latter having been finally confirmed by the Court Feb. 6, 1879.   This final account as trustee or guardian shows a balance in favor of said Jayne of $306.85.   The *difference* between the two said final accounts in favor of said Jayne, is $176.39.

Fourteenth. T. S. Manley filed a "first and final" account of his administration in the Orphans' Court of Bradford County, which was finally confirmed by said Court Sept. 4, 1879.   This account shows a balance in the hands of said administrator of $1,381.97, which is the fund for distribution.

Fifteenth. The fund for distribution is the residue of the proceeds of the sale of the farm sold by W. S. Jayne, executor to Solon J. Hickok.

His conclusions of law upon the facts found were as follows:

Sixth. The foregoing disposes of all questions except the conflicting claims of the children and grandchildren of Noah

Macer upon the one side, and of John Gilmore upon the other. The former claimants are the cousins and the children of a deceased cousin of the intestate on his mother's side, and the latter claimant, John Gilmore, is the intestate's paternal uncle. If the land was not converted into personalty by the executor's sale of it, under the power in the will, then John is not entitled, for he is not of the blood of the first purchaser; Act of April 8, 1833, Sec. 9, Br. Purd., p. 808, Sec. 27. On the other hand, if by the sale the proceeds became personalty, then this fund must go to John Gilmore, as next of kin, under the 7th section of said Act; Br. Purd, 808, Sec. 24. The next of kin are to ascertained by the rules of the civil law; 45th Penn, St. R., 430. By these rules John is related to the intestate in the third degree of consanguinity, whereas the children of Noah Macer are in the fourth degree. The principal question, then, is, did the executor's sale of the farm convert the proceeds into personalty, or do they retain the character of land, and descend as such?

Quite a large number of authorities were cited by counsel for either side, and the counsel for the Macer children filed with the auditor a number of propositions, with the request that he find the same as conclusions of law. The citations and the propositions are all annexed to this report.

It cannot be denied that this is a case of a naked power, which was exercisable at the *discretion* of the executor. The following is the language of Judge Pearson in his charge in the case of Stoner vs. Zimmerman, and was fully approved by the Supreme Court in the same case; 9th Harris, 394. "There "is no principle better settled in equity than that money "directed or agreed to be laid out in land, is to be considered "as such, and, *e converso*, land ordered or agreed to be con-"verted, is considered as money. But to establish a conversion "the will must direct it absolutely, or out and out, irrespective "of all contingencies, and independent of all discretion * * "The direction to convert must be positive and explicit, and "the will, if it be by will, or the deed, if it be by contract, "decisively fix upon the land the quality of money. * * * "It must imperatively direct that the land shall be sold. "Judge Kennedy says that the sale must be absolutely and

3 Wa 8

"positively directed, and the land is then converted into money "from the time of the testator's death."

Notwithstanding the above language it is conceived that the rule which requires a positive direction to sell independent of all contingencies and discretion, in order to work a conversion, has been applied only to cases where there was either an unauthorized sale, or where there was no sale at all, but where it was claimed that *a naked authority* to sell worked a conversion of itself under the 13th section of the Act of 24th February, 1834, which gives to executors possessing only a naked authority to sell real estate the same interests therein, and the same powers and authorities over such estate *for all purposes of sale and conveyance, and also of remedy by entry, action or otherwise, as if the same had been devised to them to be sold.* Such was the case of Chew vs. Nicklin, 9 Wright, 84. There was no sale in fact. The simple question was whether *a bare power to sell worked* a conversion. It was held that it did not. In the case of Stoner vs. Zimmerman, *supra*, the power of the executor to sell rested in the discretion, not of himself, but of the heirs, one of whom, without having exercised that discretion in favor of a sale, died, leaving a daughter, Barbara. The sale was made and it was held not to have worked a conversion of the interest of Barbara, but that the proceeds descended to her as land. This was on the ground that the sale as to her interest was unauthorized. Nagle's Appeal, 1 Harris, 260, was a case similar to the last. The devise was to the testator's widow during widowhood, and after her decease, *if a majority of the children agree*, land was to be sold. One of the children died in 1845, and the widow died in 1847. The sale took place after the widow's death. Of course the interest of which the child died seized was a *real* interest. At the child's death the sale had not taken place, nor had there at that time been any agreement of a majority of the children to sell. No agreement to sell would have been valid unless made after the widow's death. The child's interest was held to be *realty*. If there had been an agreement of a majority of the heirs, and a sale had taken place in the lifetime of the deceased child, and after the widow's death, there can be no doubt that a conversion would have taken place, though there was no positive or

express direction to sell, and though the sale depended solely upon the contingency of such agreement, and rested entirely in the discretion of the heirs. Lloyd vs. Heart, 2 Barr, 473, was a case where real estate was sold by the committee of a lunatic under an order of Court for maintenance and to pay debts. In this case, upon principles peculiarly applicable to the situation and property of lunatics, it was held that the sale did not work a conversion. Mr. Justice Coulter, in Dyer vs. Cornell, 4 Barr, 359, says that the decision in Lloyd vs. Heart "was bottomed on the provisions of the statute author- "izing the sale and the idiosyncrasy of the state and condition "of the unfortunate subjects of that statute." There can be no doubt that Isaiah Gilmore was the victim of intemperance at times. It is equally clear that his mother had that fact in mind when she placed the property under the control of a trustee; but can it be argued thence that this vice was her only motive for creating the trust, or would the auditor be justified in holding Isaiah's condition to be on a footing with that of a lunatic under a committee. The difference is too apparent for argument.

The cases above reviewed are believed to be the principal Pennsylvania cases relied on by counsel for the Macer children. An English case, that of Ackroyd vs. Smithson, Lead. Cases in Eq., Vol. 1, page 809, (H. & W.) has been strongly urged upon the attention of the auditor, and is claimed to be decisive of the case in hand. It was this: The testator gave several legacies, and ordered his real and personal estate to be sold, his debts and legacies to be paid out of the proceeds arising from the sale, and the residue thereof he gave to certain legatees, in the proportion of their legacies. He gave nothing to the heir at law, nothing to his next of kin. Two of the residuary legatees died *before the death of the testator. Held* that the two shares, so far as they were constituted of the proceeds of land, should descend to the heir, and so far as they arose from the sale of personal property to the next of kin. The opinion does not appear *in extenso* in the report of the case, but the syllabus indicates that the decision went upon the ground that the two shares were lapsed legacies. The elaborate argument of the counsel (afterward Lord Eldon) for

the heir, proceeds, however, upon the ground that "where the "testator directs real estate to be sold for special purposes, if "any of those purposes become incapable of taking effect, the "heir at law shall take, because there is an end of the disposi- "tion when there is an end of the purposes for which it is "made." And this is the principle upon which the Macer children, through their counsel, claim this fund. There are some respectable *dicta* in our own reports in support of this view, but no case appears to be decided upon the ground stated, especially where the land has been sold under a power *during the life of the beneficiary.*

. Among the cases cited on behalf of John Gilmore, several were cases of sale under order of Court, where the proceeds were decided to be personalty. It is intimated in some of our cases that there is a difference in the character of the proceeds where a sale is made under a power, and when under an order of Court. Without attempting to decide whether this is so, the auditor is content to examine only cases of sale under power in a will. In the case of Wharton vs. Shaw, 3 W. and S., 124, the testator devised as follows : "The remaining equal "fifth part of the residue of my estate I give and devise to "Mary Shaw, my said daughter, her heirs and assigns, in trust "that she shall use the rents, issues and the profits thereof, and "the interest thence arising, for the benefit of my son, Samuel "Burgess Shaw, in such manner and at such times, and in such "proportions as she shall judge proper during his natural life, "but so that the same shall not be liable to the debts of said "Samuel ; and after the death of said Samuel, that she convey "the said devise (being the remaining equal fifth part of the "residue of my estate) to such child or children as the said "Samuel shall have in equal proportions in fee tail." After which the testator appoints his son, Thomas Shaw, and his daughter Mary Shaw, executor and executrix of the same, thereby also "giving to them full power and authority to sell, "convey or alter the whole or any part of his estate, but directing that the proceeds thence arising be settled in the same manner as the property sold would according to the directions of his will have been, in case it had not been sold. The personal estate proved insufficient to pay the debts, and

the executors, under the authority in the will, sold the land. It was decided that the interest of Samuel Burgess Shaw was personalty, upon two grounds. First. That whenever a bequest is made of personal estate in terms that would create and pass an estate tail, if it were real, the legatee will take an absolute interest in the same. Second. That the property being changed by a sale under an authority given by the testator himself it can no longer be considered real estate, *unless from his will it appears clearly to have been his intention that the money which might arise from the sale should be considered real estate*, or be again vested in the purchase of other real estate. It nowhere appears from the will of Harriet Gilmore that if a sale should be made of the land, in pursuance of the authority which she gave the executor, the proceeds were to be considered real estate, nor does any direction in the will require that such proceeds shall be re-invested in real estate. On the contrary, the testatrix requires that the executor "shall secure the *avails* "on bond and mortgage at interest for the use of Isaiah "during his lifetime," thus indicating a clear intent that the proceeds shall in fact be personalty. It would seem, therefore, that if the character of the proceeds depend upon the *intent* of the testator as disclosed by the will, (which is claimed to be the law in many cases) then the will of Harriet Gilmore itself stamps the fund as personalty. On the argument it was urged on behalf of the Macer family that Harriet did not convert the property herself, and that it was not converted in her lifetime. Perhaps not, strictly speaking, yet the authority by which it was converted was given by her, and lived after her death. It was exercised in the lifetime of Isaiah, the beneficiary, and by its exercise the proceeds vested in him as personalty. "The general rule is that if land be sold for a specific "purpose the surplus money sh ill, as between the kin and next "of kin, be considered as land so far as to vest in the persons "who would have been entitled to it had it remained uncon- "verted. But, *after it has so vested* in the person entitled, it is "to be treated as money in his hands, and in case of his subse- "quent death, goes to his personal representatives as personal "estate." Pennell's Appeal, 8 Harris, 517.

The auditor deems it unnecessary to examine further the

cases cited by counsel.   Wharton vs. Shaw and Pennell's Appeal standing unimpeached in our law, appear decisive of the question in favor of the claim of John Gilmore.   In the case of Ackroyd vs. Smithson, the two shares in dispute never vested in the parties appointed in the will to receive them. The parties died before the testator.

---

The Orphans' Court confirmed the report, and Noble Macer et al. appealed.

*Messrs. Williams and Angle,* for appellants, cited Lanes' Appeal, 28 Pa., 487; Kraut's Appeal, 60 Pa., 380; Danner vs. Shisler, 31 Pa., 289; Ortt's Appeal, 35 Pa., 267; Simpson vs. Kelso, 8 Watts, 247; Lloyd vs. Hart, 2 Pa., 475; Earp's Appeal, 75 Pa., 119; Ashhurst's Appeal, 77 Pa., 464; Ackroyd vs. Smithson, 1 Leading Cases in Equity, 809; Blight vs. Bank, 10 Pa., 131; Robert's Appeal, 3 Wr. 417; Culbertson vs. Duly, 7 W. & S., 195; Neff's Appeal, 52 Pa., 326; Nagle's Appeal, 13 Pa., 264.

*Messrs. Davies, Carnochan and Hall, contra,* cited Morrison vs. Semple, 6 Bin., 94; Smith's Appeal, 23 Pa., 9; Braden vs. Cannon, 1 Gr., 60; Burd vs. Burd, 40 Pa., 182; Mandersen vs. Lukens, 23 Pa., 31; Passmore's Appeal, 23 Pa., 381; Rewalt vs. Ulrich, 23 Pa., 388; Letchworth's Appeal, 90 Pa. 175; Womrath vs. McCormick, 51 Pa., 504; Fahrney vs. Holsinger, 65 Pa., 388.   The estate was converted into personalty by the sale, Wharton vs. Shaw, 3 W. & S., 124; Pennell's Appeal, 20 Pa., 517.

The Supreme Court affirmed the decree of the Orphans' Court on May 1st, 1882, in the following opinion, per

MERCUR, J.

This contention is between claimants to the estate of Isaiah Gilmore.   He died intestate, unmarried and without issue. The fund in question is the proceeds of a mortgage which he owned at the time of his death.   This mortgage was given on a sale of land devised to him by his mother, Harriet Gilmore. She made him the residuary devisee of all her real and personal estate, but directed the property "to be and remain under the care and direction of a guardian for his use and benefit," and

appointed Wm. S. Jayne executor of her will "to see that the same is fully carried into effect." She further appointed said Jayne "to be the guardian perpetually over the property devised "to my son Isaiah, with full power and authority to appoint a "successor in case of death, removal or any inability to longer "serve, to see that his estate hereby devised, both real and "personal, be properly taken care of, and not permit him to "squander the same in any useless manner or enterprise. as far "as it can reasonably be done by the guardian, but that it may "be all strictly applied for his benefit during his lifetime in such "manner as shall be for his comfort; and further I hereby "authorize and empower my executor if it should at any time "become necessary under any circumstances hereafter in his "judgment, or that of his successor, to sell all my real estate "and secure the avails on bond and mortgage, at interest, for "the use of my son, Isaiah, during his lifetime."

Letters testamentary were issued to Jayne and he entered upon and discharged the duties of executor and also of testamentary trustee of the estate. Under the power contained in the will, and during the life of Isaiah, Jayne, as executor, sold and conveyed the real estate thus devised to Isaiah. In part payment therefor the mortgage was given, and the portion thereof remaining unpaid at the death of Isaiah produced the fund now in contention. It is claimed by the appellants that the mortgage having been given for lands devised to Isaiah by his mother, the fund stands as real estate and is to be distributed accordingly. It may be conceded that the will does not contain such positive and explicit directions to sell the real estate as to work a conversion on the death of the testatrix. A mere power to sell without that power being exercised does not work a conversion. This will gave no power or discretion to Isaiah in regard to the sale. Both power and discretion were given to the executor. His judgment alone was to determine the necessity or propriety of making a sale, and if he sold he was given full power to convert the real estate into personal property. In strict conformity with authority contained in the will, he did make the conversion. Thenceforth Isaiah ceased to own the real estate; but held the demand for money secured by the mortgage. It was clearly personal estate

thereafter. As such it went to the appellee, who is one degree nearer than the appellants to the intestate. The fact that the appellants are of the blood of Harriet Gilmore, and the appellee is not, gives them no superior right to the fund, which is clearly the personal estate of Isaiah Gilmore, The principle that where a power to sell real estate is given, and a sale has been made under the power, the proceeds become personal property is clearly affirmed in Wharton vs. Shaw, 3 W. & S., 124, and in Pennell's Appeal, 20 Pa., 517. The testatrix used no restrictive words to prevent Isaiah from disposing of the estate by will, or if he died without will to prevent his heirs at law from taking it. The appellee is such heir.

     Decree affirmed and appeal dismissed at the costs of the appellants.